IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| TARA DELGADO,<br><br>                Plaintiff,<br><br>vs.<br><br>GGNSC GRAND ISLAND<br>LAKEVIEW LLC,<br><br>                Defendant. | 4:15-CV-3124<br><br>MEMORANDUM AND ORDER |

The plaintiff, Tara Delgado, has sued her former employer, GGNSC Grand Island Lakeview LLC, for sexual harassment, hostile work environment, retaliation, retaliatory hostile work environment, and gender-based discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Nebraska Fair Employment Practices Act, Neb. Rev. Stat. § 48-1101 *et seq.* Filing 15.[1] The defendant has moved for summary judgment. For the reasons explained below, the defendant's motion will be granted in part and denied in part.

## BACKGROUND

The defendant, GGNSC Grand Island Lakeview ("Golden Living"), runs a skilled nursing facility that provides long-term care to elderly residents. Filing 47 at 2. The company has at least two facilities in Grand Island, Nebraska: Golden Living Lakeview, and Golden Living Park Place.

---

[1] Delgado's state-law claims are substantially identical to their federal equivalents, so there is no need to consider them separately. *See, Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1039-40 (8th Cir. 2005); *Orr v. Wal-Mart Stores, Inc.*, 297 F.3d 720, 723 (8th Cir. 2002).

## 1. PLAINTIFF'S EMPLOYMENT

Delgado began her employment with Golden Living in 2002 at its Park Place location. She later transferred to the Lakeview facility, where she worked until taking medical leave in December 2014. Filing 47 at 3, 8. At the start of her employment, Delgado received training on Golden Living's anti-harassment policy, which the company refers to as the "Four-Step Compliance Communications Process." Filing 53 at 5. That policy outlines four paths employees may use if they believe they have been the victim of, or a witness to, unlawful behavior. The Four-Step Process directs employees to:

> First, talk to your supervisor. He or she will be familiar with the laws, regulations and policies that relate to your work, and will be able to handle most matters.

> If you are not comfortable talking with your supervisor (for example, if you are questioning your supervisor's conduct), talk to your supervisor's supervisor, or human resources.

> If you feel the matter cannot be handled at your department level, contact your compliance liaison—your group's vice-president.

> If none of the above steps resolves your questions or concerns, or if you prefer, call the toll-free Customer Response and Compliance Hotline at 800-572-9981. All calls are confidential, and you may call anonymously if you choose.

Filing 46-4 at 16. All employees were trained on this policy, and it was published in Golden Living's employee handbook. Filing 47 at 3. In addition to the Four-Step Process, a victim or witness could report sexual harassment to any supervisor[2] or to human resources personnel by filling out a problem resolution form available to all employees. Filing 53 at 3–4.

Delgado transferred to Golden Living's Lakeview facility in July 2015. Initially, Delgado was a bath aid, but she later held the positions of med aide, certified nursing assistant (CNA), central supply and scheduling, and restorative aide. Filing 46-3 at 3, 5-6. From around 2011 to 2014, Delgado primarily worked as a restorative aide—but she was occasionally assigned to the CNA or med aide positions depending on staffing. Filing 46-3 at 5–6; filing 46-3 at 7.

Delgado's direct supervisor differed depending on her assigned duties during a particular shift. *See* filing 52-1 at 11. For example, on days Delgado worked as a CNA or med aide, her direct supervisor was the charge nurse on duty; but if she was working as a restorative aide, her direct supervisor was another Golden Living employee named Kim Long. Filing 53 at 6. Jackie Connery, the assistant director of nursing, provided the next level of supervision, and she was in turn supervised by Laura Wolfe, director of nursing. Filing 47 at 4. The facility's executive director was Dean Dragon.

---

[2] The parties dispute the meaning of the term "supervisor" for the purposes of reporting harassment. Delgado contends that any person in a managerial position was a supervisor. Golden Living argues that Delgado's overbroad interpretation would define most Lakeview employees as supervisors. For example, Delgado describes the following individuals as supervisors: the facility's office supplies manager, Lurleen Statler; the medical records clerk, Melissa Trejo; and the facilities' van driver, Marcia Pointer. Defendant disputes that these individuals qualify as supervisors and limits the term to include the director of nursing, the assistant director of nursing, and the executive director. *See* filing 55 at 11.

Filing 47 at 5. Brenda Knutson was the Nebraska area vice president for Golden Living, filing 53 at 27, and Kris Laverty was an HR consultant based in Omaha, Nebraska. *See* filing 53 at 26; filing 55 at 9.

## 2. ALLEGED HARASSMENT

Roy Miller was hired as the facility's maintenance director on March 31, 2014. Soon after, Delgado claims that Miller began harassing her—calling her sexually discriminatory names, making sexually charged statements, and subjecting her to unwanted and inappropriate touching. According to Delgado, Miller's alleged conduct continued on a near constant basis over the following 6 months. Filing 47 at 4.

On or around June 11, 2014, Delgado claims that Miller cornered her in an empty patient room and sexually assaulted her, grabbing her breasts and buttocks. Filing 47 at 5; filing 52-1 at 28. Delgado claims to have reported the assault to her sister and coworker, Lacie McGee, immediately after it happened. Filing 52-1 at 29. Then, she says, she completed a problem resolution form reporting Miller's behavior, but when she attempted to deliver it to Dragon (the executive director), he was not in his office. So, Delgado states that she slid the completed form under his office door. Filing 53 at 11.

Over a month later, on July 17, 2014, Miller allegedly assaulted Delgado again—this time touching her buttocks. Filing 47 at 5; filing 52-1 at 30. Delgado asserts that she discussed Miller's behavior with McGee, before completing another resolution form regarding Miller's conduct. Delgado claims to have placed the resolution form—like she had done before—under Dragon's office door. Delgado then says she reported Miller's actions to the office supplies manager, Lurleen Statler, who purportedly responded: "oh honey, you should write him up for that." *See* filing 52-3 at 10-11.

The parties dispute whether Dragon or any other employee received or saw the resolution forms Delgado claims to have left under Dragon's door. Dragon says he never received the forms, and there is no indication that Delgado personally followed up with him to make sure that he did. Filing 47 at 5; filing 52-1 at 28. Further, other employees with access to Dragon's office deny ever seeing the forms. Filing 46-11 at 4–5. But Delgado claims that after submitting the forms, Miller became distant and began using derogatory language when speaking or referring to her. Filing 53 at 11. This change in demeanor, Delgado says, is evidence that Dragon received and discussed the resolution forms with Miller.

In July 2014, Delgado requested a copy of the employee handbook to review Golden Living's policy for reporting harassment and to retrieve the hotline number. But after receiving the handbook, she did not review it, and did not immediately call the hotline. Filing 55 at 10; *see* filing 52-1 at 20-22. However, Delgado claims to have called the number months later—in or around September 2014—but it is unclear what, if anything, she reported. Filing 52-1 at 22.

On September 18, 2014, Delgado approached Connery, the assistant director of nursing, and asked if Dragon was going to follow up on her complaints. Connery inquired further, and Delgado informed her of Miller's behavior and actions. Filing 47 at 7; filing 46-3 at 25. Connery was supportive of Delgado, and by the next day, she (Connery) had contacted HR consultant Laverty. Filing 46-11 at 5. Laverty and Knutson (Golden Living's Nebraska-area vice president) investigated Delgado's complaint, concluding that Miller did, in fact, violate Golden Living's anti-harassment policy. Miller's employment was suspended during the investigation, and ultimately terminated. Filing 47 at 7-8.

Prior to September 18, 2014, Delgado did not directly report Miller's harassing behavior and conduct to Laura Wolfe, Jackie Connery, or Dean Dragon. Filing 46-3 at 26. However, Delgado says that she complained about Miller's conduct to her direct supervisor, Long, as well as other facility managers—namely, Statler and Pointer. Delgado claims that Long, Statler, and Pointer generally told her to "write him up," but otherwise ignored her complaints. Filing 53 at 15.

### 3. EXTENT OF HARASSMENT AND OTHER COMPLAINTS

According to Delgado, a large majority of the facility's female employees fell victim to Miller's sexually harassing behavior, which numerous supervisors and employees purportedly witnessed first-hand. *See* filing 52-1 at 23. Indeed, Delgado says that she personally witnessed Miller harass employees Kayla Miller, Lacie McGee, and Melissa Trejo. Filing 53 at 9. And, Delgado says, "supervisors" Lurleen Statler, Kim Long, and Kayla Rohmiller each witnessed Miller sexually harass Delgado. Filing 53 at 14.

Golden Living claims that the harassment was not wide-spread. After all, it argues, while many of the individuals identified by Delgado admitted to hearing rumors and gossip concerning Miller's alleged conduct, very few actually witnessed it. *See e.g.*, filing 46-20 at 3; filing 46-21 at 3–5; filing 52-4 at 16–17; filing 46-11 at 17–18; filing 52-7 at 8; filing 55 at 4. For example, Delgado specifically names employees Claudia Lopez and Maricruz Aguilera for the proposition that, as of May 2014, "numerous female employees [had] reported Miller's sexual harassment." Filing 53 at 16; filing 52-1 at 37. But when deposed, Lopez testified that she never heard Miller say anything of a sexual nature and never saw him engage in sexual contact. Filing 46-21 at 4. And Aguilera testified that while Miller bumped into her in the halls, she had

not personally experienced or heard his sexually suggestive comments or behavior. Filing 46-20 at 3.[3]

Other employees provided similar testimony. For example, Jackie Connery was purportedly aware—through office gossip—of Miller's behavior, but she did not see or hear any sexually harassing conduct or speech. And when she spoke with Trejo about a hotline tip (in which a caller reported Trejo as being a victim of improper sexual contact), Trejo denied the report. Filing 46-11 at 3. Further, Lurleen Statler claims to have heard about Miller's alleged harassment of Delgado, but she did not personally experience or witness such conduct during Miller's employment with Golden Living. Filing 46-18 at 2. And while Marsha Pointer thought Miller was "rude and obnoxious," she, too, did not personally witness or hear any sexually-suggestive comments or behavior. Filing 46-19 at 3.

But as noted above, Delgado claims to have experienced and witnessed Miller's harassment first-hand. *See* filing 52-1 at 23. For example, in addition to her own allegations, Delgado claims that, on one occasion, she saw Miller

---

[3] But as discussed below, Golden Living also provided as evidence interview statements from various employees stemming from the company's internal investigation. During the investigation, Lopez and Aguilera were asked whether anyone had ever touched them or said inappropriate things to them at work. Lopez responded: "Yes, Roy always flirts and tries to touch people. I came in one day to pick up shifts and I was in street clothes. He saw me and said 'damn you look so good you are going to make me bust a nut.' . . . He always says I'm mean and a bitch because I just ignore him." Filing 46-9 at 3. Aguilera said, "One day me and Claudia went to the staffing office when Lacie was doing the schedule and Roy saw us come in. He said, 'I never realized how big those were until I saw you in street clothes.' He was talking about our boobs. . . . Me and Claudia went to Dean and told him about the comment he made to us. Dean said Roy wasn't that way and that he couldn't do anything about it." Filing 46-9 at 4.

grab another employee's breast. Filing 52-1 at 25. She also claims that Miller grabbed the back of a different female employee's hair

> and made gestures like down towards his crouch [sic], like push her head down. And she'd be like, Roy, stop it, stop it. And he'd pull the back of her ponytall [sic] backwards and say, you know you like that, you know you like that.

Filing 52-1 at 26. Record evidence—including statements from both of the alleged victims—does, to some extent, substantiate Delgado's account. *See*, filing 46-8 at 3; filing 46-9 at 3.

Delgado also testified to Miller's alleged verbal harassment. To this end, Delgado claims that Miller would often approach groups of women with sexually suggestive comments. *See* filing 52-1 at 24. According to Delgado, Miller would sometimes direct his comments to the entire group; but more often, he would single out one member of the group. Filing 52-1 at 25. On one occasion, Delgado says,

> we [Delgado, Long, and Miller] had went outside, got in the shed, whatever. We were coming out of the shed and there was some people up on the roof fixing the roof or fixing the air conditioner[.] . . . [Miller] yelled up to them and pretended like he was zipping up his pants and said, yep, it's just one of the perks of the job.

Filing 52-1 at 27 55. Other employees provided similar testimony. *See*, filing 52-6 at 12-19; filing 52-4 at 3-4; filing 52-7 at 8. And records from the company's internal investigation of Miller suggest that multiple employees either witnessed first-hand, or heard through colleagues, Miller's use of

sexually inappropriate words or gestures. *See* filing 46-9. One employee reported being "sick every time I come to work because I worry about [Miller]. I lock the door to my office unless Nikki is there with me." Filing 46-9 at 3.

As noted above, prior to Delgado's complaint to Connery in September 2014, at least one other employee reported Miller's conduct to the company's hotline. The reporting employee claimed that Miller had sexually harassed and assaulted Melissa Trejo, the medical records clerk at the facility. Filing 47 at 7. Responding to the report, Laverty and Knutson traveled to the facility to conduct an investigation into Miller's alleged conduct. Laverty and Knutson interviewed Trejo, who expressly denied that she had been harassed. Filing 47 at 7. Later, when deposed for this matter, Trejo said that she lied to the investigators out of fear of losing her job. Filing 47 at 7.

### 4. ALLEGED POSITION-RELATED RETALIATION

Delgado claims that Golden Living retaliated against her in the terms of her employment after she purportedly placed the complaints under Dragon's door. *See* filing 52-1 at 12-13. Specifically, she contends that, beginning in 2014, she was consistently assigned to work as a med aide. Filing 47 at 18. And while this change did not affect her pay, med aides—unlike restorative aides—had to report to work at 6:00 a.m. This earlier reporting time impacted her ability to drive her children to school in the mornings. Filing 52-1 at 11; filing 53 at 20. Delgado also claims that she, unlike other employees, was assigned multiple positions or tasks at once. As a result, she was forced to oversee medications for 18 people, give 2 or 4 baths, answer call lights, and make beds—all of which, she says, amounts to "three full-time positions [i]n one shift." Filing 53 at 21-22; filing 52-1 at 14. These scheduling changes were purportedly initiated by the assistant director of nursing, Connery, and the director of nursing, Wolfe.

According to Golden Living, Delgado's assignment change was neither a demotion nor retaliatory. Rather, it argues that Delgado's work assignments changed in accordance with the facility's needs during the relevant time period. Filing 46-11 at 4. And in any event, the change could not have been retaliatory because the supervisors in charge of scheduling knew nothing about Delgado's alleged complaints.

After Miller was fired in September, Delgado claims her hours were cut and that she lost wages. However, Delgado's hours and pay were not lowered; in fact, her paystubs show she received more hours in the fall of 2014 than she had in the spring, and her hourly pay remained the same from April to December 2014. Filing 55 at 13; filing 56-4.

### 5. ALLEGED VERBAL RETALIATION/HARASSMENT

Delgado further alleges that, following Miller's suspension, she was subjected to retaliatory harassment until her eventual departure in December 2014. Filing 53 at 2. Specifically, she says that other employees accused her of lying, claiming that she had secret motives for reporting Miller. She claims to have reported this harassment to Connery and Wolfe— but, she says, neither acted on her reports. Delgado did not, however, report the alleged verbal harassment to Laverty or Knutson, and it was not observed or reported by other employees.

### 6. PLAINTIFF'S MEDICAL LEAVE

On December 23, 2014, Delgado went on medical leave at the recommendation of her mental health provider. Delgado provided documentation to Golden Living indicating she had post-traumatic stress disorder and required a leave of absence. Delgado has also suffered an unrelated back injury which prevents her from returning to work. As of May 2016, Delgado had not returned to work due to her conditions.

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The existence of a mere scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

ANALYSIS

Delgado has sued Golden Living for sexual harassment based on a hostile work environment; retaliatory hostile work environment; retaliation for reporting Miller's conduct; and gender discrimination. Golden Living moves for summary judgment as to each of these claims. It further argues that, assuming any claims survive summary judgment, the Court should limit Delgado's ability to recover punitive damages and lost wages incurred after June 2015.

### 1. SEXUAL HARASSMENT: HOSTILE WORK ENVIRONMENT

Delgado alleges that Miller, her co-employee, subjected her to unwelcome sexual harassment. To establish a prima facie case against an employer for sexual harassment by one of its employees, Delgado must show: (1) she is a member of a protected group; (2) was the victim of unwelcomed sexual harassment; (3) the harassment occurred because of her sex; (4) the harassment affected a term, condition, or privilege of her employment; and (5) the employer knew or should have known of the harassment and failed to take proper action. *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016).

Golden Living argues that Delgado cannot establish the last element of her prima facie case—that is, that Golden Living knew or should have known of the harassment and failed to take proper action. Filing 47 at 11. To support this contention, Golden Living claims that Delgado failed to properly report Miller's conduct until September 2014, and that when she did, it immediately suspended and then terminated Miller. Delgado claims she reported Miller's conduct as early as July 2014, when she purportedly slid two separate complaint forms under the locked office door of the facility's executive director, Dragon, and by telling Kim Long, her direct supervisor, as well as "facility managers" Statler and Pointer. Delgado further suggests that

the sexual harassment was so pervasive that constructive knowledge must be imputed to Golden Living. *See Myers v. Croell Redi-Mix, Inc.*, 672 F. Supp. 2d 889, 915 (N.D. Iowa 2009) ("the harassment was so severe and pervasive that management reasonably should have known of it") (quoting *Weger v. Ladue*, 500 F.3d 710, 721 (8th Cir. 2007)). Finally, Delgado claims that any reporting of sexual harassment by Miller would have been futile because Dragon "believed Miller over every other employee," filing 53 at 18, and that Laura Wolfe, the director of nursing, and Jackie Connery, the assistant director of nursing, "both flirted and made sexual comments to and with Roy Miller in the hallways." Filing 53 at 12.

As a preliminary matter, the reporting requirement, at least on these facts, is mandatory. Thus, Delgado cannot overcome that element of her prima facie case with allegations of futility. *Weger*, 500 F.3d at 725. Rather, to establish her prima facie case, she must show that the employer knew or should have known of the harassment and failed to take proper action.

An employer's "knowledge" for purposes of sexual harassment liability can be either actual or constructive. Where an employer has a specified complaint procedure that identifies the persons to be notified, "actual notice is established when the employee notifies those individuals." *Myers*, 672 F. Supp. 2d at 913 (citing *Jenkins v. Winter*, 540 F.3d 742, 749 (8th Cir. 2008)). Constructive notice, on the other hand, exists where the harassment is so severe in character and pervasive in the workplace that "it must have come to the attention of someone authorized to do something about it." *Sandoval v. American Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 802 (8th Cir. 2009) (emphasis omitted). This standard requires more than a handful of observations or remarks made over a "substantial period of time." *Weger*, 500 F.3d 722. Rather, constructive notice is shown when the harassment is so

widespread as to be "obvious to everyone." *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1265 n.3 (8th Cir. 1997).

It is undisputed that Golden Living had actual knowledge of Miller's conduct as of September 2014, and took immediate action to terminate his employment. But there is a genuine issue of fact as to whether the company knew—or should have known—of the alleged harassment before that date. Indeed, Delgado claims that she slid complaint forms detailing Miller's conduct under Dragon's door as early as July 2014, and that she verbally reported the harassment to her supervisors. And while Dragon denies ever receiving Delgado's complaints, a reasonable jury could—on these facts— conclude otherwise. Further, assuming the truth of Delgado's position, it appears that the means by which she reported the harassment complied with the company's four-step process for reporting such conduct. Filing 46-4 at 16; filing 52-8 at 17; filing 52-9 at 9-12.[4]

Delgado may also pursue her theory of constructive notice. To this end, the Court finds enough evidence at this stage for a reasonable jury to conclude that Miller's alleged harassment was so pervasive that "it must have come to the attention of someone authorized to do something about it." *Sandoval*, 578 F.3d at 802 (emphasis omitted). Indeed, as summarized above, the record includes testimony from several witnesses who either experienced the alleged harassment, witnessed it, or heard about it (albeit often through rumors) at some point during Miller's 6-month tenure. *See*, filing 52-1 at 23-

_____

[4] Golden Living argues that Delgado failed to comply with the four-step process, and therefore is foreclosed as a matter of law from pursuing her "actual" knowledge argument. *See* filing 47 at 12. But the process specifically provides that if the employee is not comfortable talking with her supervisor, she can "talk to [her] supervisor's supervisor." Filing 46-4 at 16. The Court does not see how Delgado, in attempting to notify the executive director (as she claims), failed to follow this protocol.

30 (Delgado); filing 52-7 at 8 (Connery); filing 46-8 at 3 (McGee); filing 52-4 at 4 (Pointer); filing 52-6 at 7-26 (Trejo); filing 46-18 at 3 (Statler). And at least two of the witnesses who expressly denied hearing or seeing the harassment provided contradictory statements during Golden Living's internal investigation. *Compare* filing 46-20 at 3; filing 46-21 at 3, *with* filing 46-9 at 3-4.

It is true, as Golden Living argues, that Delgado's response relies extensively on hearsay statements from third parties. But the standard on summary judgment is not whether the evidence would be admissible at trial, "it is whether it *could* be presented at trial in an admissible form." *See*, Rule 56(c)(2); *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012). And the Court presumes, at least at this stage, that the alleged victims of Miller's harassment could testify to their own experiences during Miller's employment at Golden Living.[5] Golden Living's motion for summary judgment on this claim will be denied.

## 2. RETALIATION

Delgado claims that she was retaliated against in the terms, conditions, and privileges of her employment after reporting Miller's harassing conduct. To establish a prima facie claim for retaliation, Delgado must present facts showing: (1) she engaged in protected conduct, (2) she was subjected to an adverse employment action, and (3) there is a causal nexus between her protected conduct and the adverse action. *Wood v. SatCom Mktg., LLC*, 705 F.3d 823, 829 (8th Cir. 2013). Golden Living argues that Delgado's claim fails

---

[5] That said, the Court is fully aware of the exacting standard for establishing constructive notice under Title VII. *See Smith*, 109 F.3d at 1265 n.3. And while Delgado has presented enough to overcome Golden Living's motion at this stage of the proceeding, the Court may, or may not, revisit this issue prior to or during trial.

as a matter of law because she has not come forward with any evidence that she suffered an adverse employment action. Filing 47 at 17.

To satisfy the "adverse employment action" requirement, Delgado must show "that a reasonable employee would have found the challenged action materially adverse." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006). This, in turn, requires a showing that the employment action "might have dissuaded" a reasonable worker from reporting the alleged harassment. *Id*. To meet this burden, Delgado must demonstrate that the employment action was material, not trivial, and that it resulted in some concrete "injury or harm." *AuBuchon v. Geithner*, 743 F.3d 638, 643-44 (8th Cir. 2014). After all, reporting discriminatory behavior "cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id*. (quoting *Burlington*, 548 U.S. at 68)).

As noted, Delgado argues that she was retaliated against in several respects for reporting Miller's conduct. Specifically, she alleges that Golden Living cut her hours, reassigned her to a less desirable position, and assigned her extra work. She also contends that employees and supervisors directed hostile remarks toward her, resulting in a retaliatory hostile work environment. But as discussed below, many of these allegations are unsupported by the record evidence, or otherwise amount to slights or annoyances that, under Supreme Court precedent, do not give rise to a retaliation claim under Title VII. *See Burlington*, 548 U.S. at 68. Accordingly, Golden Living's motion for summary judgment as to Delgado's claims for retaliation and retaliatory hostile work environment will be granted.

*(a) Job Reassignment*

Delgado first contends that Golden Living wanted her to quit and therefore "overloaded her with work, cut[] her hours and reassigned her to a different position." Filing 53 at 22. To support this contention, Delgado claims that, prior to reporting Miller's sexually harassing conduct, she worked as a restorative aide for Golden Living, with her work day beginning at 7:30 a.m. After she complained about Miller, however, she was assigned to work as a med aide, with her workday beginning at 6:00 a.m., and on at least one occasion, she was assigned to perform multiple duties resulting in a very heavy workload. Although Delgado received the same pay for these positions, she claims the change in her work schedule adversely impacted her because she could no longer take her children to school before going to work. She claims that any time someone was permitted to work as a restorative aide instead of her, the job assignment was made in retaliation for complaining about Miller. Filing 52-1 at 10, 15.

But "not everything that makes an employee unhappy is an actionable adverse action." *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir. 1997). Indeed, changes in duties or working conditions that cause no materially significant disadvantage "'are insufficient to establish the adverse conduct required to make a prima facie case.'" *Hughes v. Stottlemyre*, 454 F.3d 791, 797 (8th Cir. 2006) (quoting *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994)); *see Recio v. Creighton University*, 521 F.3d 934, 940 (8th Cir. 2008) (minor changes in duties do not satisfy a claim for retaliation). Accordingly, to the extent that Delgado supports her retaliation claim on these grounds, that claim fails as a matter of law.

*(b) Loss of Hours*

Delgado also claims that the defendant "cut her hours" after she reported Miller's harassing behavior. Filing 53 at 38. Specifically, she alleges that when the facility was on "low census," her hours as a restorative aide were given to part-time employees—some of whom Delgado claims were unqualified to perform the work. Filing 52-1 at 42. But the available evidence suggests otherwise. In fact, Delgado's timecards suggest that her weekly average hours and pay actually increased after she reported Miller's harassment. Filing 56-4. Thus, it cannot be said that Delgado suffered an adverse employment action in either the distribution of her hours, or pay, following the reporting of Miller's conduct.

*(c) Assignment to Physically Strenuous Work*

Delgado also claims that she was assigned to work as a med aide in retaliation for reporting the alleged harassment. Specifically, she claims that supervisor Laura Wolfe assigned her to the med aide duties—which requires frequent bending—despite knowing that Delgado had a bad back. Filing 53 at 20. But Delgado's own testimony suggests the opposite—that is, that she was reassigned from her CNA position, to the med aide position, to *accommodate* her bad back:

Q: And you are telling me during that same period you were concerned about being physically able to do the CNA work because you thought it was too physical and too hard on your back?

A: Correct.

Q: And so you were given the med aide duties, which you were able to do?

A: Yea, I could do it.

Filing 52-2 at 4; *see also* filing 52-1 at 12 ("I spoke to [Wolfe] about being on the med cart. . . . I told her that I was under no restrictions, I didn't have any physical limitations at that time or anything."). In sum, the evidence does not support Delgado's claim of an adverse employment action on account of overly strenuous responsibilities.

### (d) Excessive Work and Improper Tasks

And finally, Delgado claims that, after reporting the alleged harassment, she was "assigned work that was to be performed by two or three full-time employees[.]" Filing 53 at 21. To this end, she suggests that the defendant improperly increased her workload, and at times asked her to perform tasks that she was not certified to do. Filing 53 at 22. But even assuming this as true, Delgado admits that she refused to perform such tasks, and there is no indication that she was disciplined for doing so. Filing 52-1 at 14, 42; *see Geithner*, 743 F.3d at 645 (holding acceleration of employee's work deadlines and assigning extra work to him is not adverse employment action). Thus, Delgado's allegations in this regard do not support her claim for unlawful retaliation under Title VII.

### (e) Retaliatory Hostile Work Environment

Although pled as a separate claim, filing 15 at 5, Delgado also alleges that she was retaliated against by means of a hostile work environment. Specifically, Delgado alleges that she was "harassed by numerous co-workers" regarding her complaints and reports of illegal conduct. Filing 15 at 3. For example, she claims that one employee told her "how Lacie and I and Melissa

were trying to tear apart this fucking company," and how "Roy would never do anything like that to us." Filing 52-1 at 39. Another employee purportedly said "so you are the one that got Roy fired, Roy didn't do anything to you." Filing 52-1 at 39. And yet another allegedly approached Delgado claiming that she "wish[es] Roy would have sexually harassed me, I would have enjoyed it, I don't know why you didn't." Filing 52-1 at 39.[6]

Retaliation claims under Title VII may be based on a hostile work environment and need not be based solely on discrete adverse employment actions that affect the terms of conditions of employment. *Stewart v. Independent School Dist. No. 196*, 481 F.3d 1034, 1042 (8th Cir. 2007). But as noted above, because Title VII was not enacted to create a general civility code, the standard for establishing an adverse employment action on these grounds is high. *See Burlington*, 548 U.S. at 68 ("[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience"). Indeed, as noted by one circuit court of appeals, to prevail on a claim for retaliatory hostile work environment, the claimant must demonstrate that the actions complained of were severe or pervasive. *See Gowski v. Peake*, 682 F.3d 1299, 1313 (11th Cir. 2012). This standard is generally evaluated by considering, among other matters, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Kirby v. Brennan*, 2017 WL 1157093, at *9 (D. Minn. 2017) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

---

[6] Contrary to the argument raised in Delgado's brief, Delgado expressly testified that managers Wolfe and Connery did not retaliate against her. Filing 52-1 at 40.

Against this backdrop, the Court concludes that Delgado has failed to meet her prima facie burden with respect to her retaliatory hostile work environment claim. While her coworker's alleged statements were no doubt unwelcome, they are not the type of severe and pervasive conduct required under Title VII. *See*, *Sutherland v. Missouri Dep't of Corr.*, 580 F.3d 748, 752 (8th Cir. 2009); *Clegg v. Arkansas Dep't of Correction*, 496 F.3d 922, 929 (8th Cir. 2007). Accordingly, Golden Living's motion for summary judgment on this claim will be granted.

### 3. GENDER DISCRIMINATION

Delgado asserts separately pled claims for gender discrimination and gender-based hostile work environment. Filing 15 at 6. As an initial matter, it appears that Delgado's gender-based hostile work environment claim is duplicative of the hostile work environment claim discussed above. *See McCurdy v. Ark. State Police*, 375 F.3d 762, 767 (8th Cir. 2004) ("Unlawful discrimination based on sex includes claims of hostile or abusive work environment sexual harassment"). The Court has already addressed the merits of that claim, and it need not do so again here.

Delgado also alleges gender discrimination, which requires a showing that: (1) she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) the facts support an inference of unlawful gender discrimination. *Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 700 (8th Cir. 2006). Golden Living urges summary judgment on the third element, arguing that Delgado has failed to demonstrate an adverse employment action. Filing 47 at 21.

For purposes of a Title VII discrimination claim, an adverse employment action is "a tangible change in working conditions that produces a material employment disadvantage." *Wedow v. City of Kan. City*, 442 F.3d

661, 671 (8th Cir. 2006). This might include "termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." *Clegg*, 496 F.3d at 926 (internal quotation marks omitted). But minor changes in duties or working conditions, "even unpalatable or unwelcome ones," which cause no materially significant disadvantage, do not rise to the level of an adverse employment action. *Id.*

As noted above, there is no evidence to suggest that Delgado experienced a cut in pay or benefits. Rather, the record indicates that Delgado experienced changes in her daily responsibilities, and at most, received additional work. But those allegations, without more, are insufficient to establish a prima facie case of gender discrimination. *See*, *Holland v. Sam's Club*, 487 F.3d 641, 644-45 (8th Cir. 2007); *Zhuang v. Datacard Corp.*, 414 F.3d 849, 854-55 (8th Cir. 2005). Golden Living's motion for summary judgment on this claim will be granted.

### 4. LIMITATION ON DAMAGES

#### *(a) Punitive Damages*

Golden Living argues that Delgado cannot recover punitive damages on her remaining Title VII claim for sexual harassment. Under Title VII, punitive damages are available "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [her] federally protected rights." 42 U.S.C. § 1981a(b)(1). The terms "malice" and "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law. *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999).

Golden Living argues that it cannot be subject to punitive damages "because there is absolutely no evidence in the record indicating that it acted with malice or reckless indifference in allegedly discriminating against Plaintiff." Filing 47 at 26. It further notes that it has an anti-harassment policy and reporting process, and upon receiving notice of Miller's conduct, it immediately investigated and fired Miller.

But, for the reasons described above, issues of fact remain as to when the company learned of the alleged harassment, and whether it intentionally disregarded earlier complaints. Thus, the Court cannot, on the record before it, foreclose Delgado's request for punitive damages at this stage of the proceeding.

*(b) Lost Wages*

The plaintiff seeks lost wages for the alleged harassment she endured. *See* filing 15 at 4. Golden Living argues that her ability to recover these damages is limited by her testimony in a parallel workers' compensation case. There, Delgado testified that she was "psychologically capable of returning to work in June of 2015." Filing 47 at 24. Golden Living claims that this statement is a "judicial admission sufficient to bind [Delgado] as a matter of law in this case," and therefore establishes that Delgado's emotional distress from the alleged harassment ceased in June 2015. Filing 47 at 25. Accordingly, it argues that the Court should limit Delgado's lost wages "to the period between December 2014 to June 2015." Filing 47 at 24.

A judicial admission is conclusive on the party by whom it was made, or to whom it is attributable. However, that effect is confined to the cause in which the admission was made, including appeals, "but not in separate and subsequent cases." *In re Somerset Apts.*, 2007 WL 552209, at \*4 (D. Neb. 2007) (citing *State Farm Mut. Auto. Ins. Co. v. Worthington*, 405 F.2d 683,

686 (8th Cir. 1968)); *see Universal American Barge Corp., v. J-Chem, Inc.,* 946 F.2d 1131, 1142 (5th Cir. 1991). Thus, while Delgado's seemingly inconsistent testimony may be explored on cross-examination, her testimony in the state workers' compensation case cannot be construed as a binding judicial admission in this federal employment case. Accordingly, the defendant's motion to bar any claim for lost wages after June 2015 based on Delgado's testimony before the workers' compensation court is denied.

## CONCLUSION

For the reasons discussed above, Golden Living's motion for summary judgment will be in granted in part and denied in part. Specifically, Golden Living's motion with respect to Delgado's claims for retaliation, retaliatory hostile work environment, and gender discrimination is granted. However, Delgado may proceed on her claim for hostile work environment based on sexual harassment.

IT IS ORDERED:

1. Golden Living's motion for summary judgment (filing 45) is granted in part and denied in part. Specifically,

   a) Golden Living's motion for summary judgment as to Delgado's claims for retaliation, retaliatory hostile work environment, and gender discrimination is granted.

   b) Golding Living's motion for summary judgment as to Delgado's claim for hostile work environment based on sexual harassment is denied.

2. Golden Living's motion to limit punitive damages and lost wages is denied.

3.    Delgado's unopposed motion for leave to submit additional

      evidence (filing 67) is granted.

Dated this 27th day of April, 2017.

BY THE COURT:

John M. Gerrard
United States District Judge